## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

CASE NO. 10-3765 (JRT/TNL)

COREY D. PRESSGROVE,

Plaintiff,

v.

**REPORT & RECOMMENDATION**

MICHAEL J. ASTRUE, Commissioner of
Social Security,

Defendant.

Edward C. Olson, Attorney at Law, 331 2nd Avenue South, Suite 420, Minneapolis, MN 55401; Jean C. Owen, Law Office of Jean C Owen, 5700 Broadmoor, Suite 500, Mission, KS 66202, for Plaintiff;

David W. Fuller, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Defendant.

## I.   INTRODUCTION

Plaintiff Corey D. Pressgrove (Plaintiff) disputes Defendant Commissioner of Social Security Michael J. Astrue's (Commissioner) denial of his protective application for disability insurance benefits (DIB).  The United States District Court for the District of Minnesota has jurisdiction under the Social Security Act. 42 U.S.C. §§ 405(g), 1383(c)(3).  This matter is before the Court, United States Magistrate Judge Tony N. Leung, for a report and recommendation to United States District Court Judge John R.

Tunheim on the parties' cross motions for summary judgment. *See* 28 U.S.C. § 636(b)(1); D. Minn. LR 72.1-2.

For the reasons set forth herein, **IT IS HEREBY RECOMMENDED** that the Commissioner's Motion for Summary Judgment (Docket No. 14) be **DENIED**; Plaintiff's Motion for Summary Judgment (Docket No. 12) be **GRANTED IN PART** and **DENIED IN PART**; the decision of the Commissioner be **REVERSED** and this matter be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings that are consistent with this report and recommendation; and **JUDGMENT BE ENTERED ACCORDINGLY**.

## II.    BACKGROUND

### a.  <u>Procedural Posture</u>

Plaintiff was born in 1968 and was 38-years old at the time on March 10, 2006— the day he filed his application for DIB. Tr. 78, 98.  Plaintiff alleges a disability onset date of September 6, 2005. Tr. 96. Plaintiff's application was denied. Tr. 49, 55. Thereafter, Plaintiff requested a hearing before an ALJ. Tr. 12, 58, 66. The hearing was held before Administrative Law Judge Roger W. Thomas on March 27, 2008. Tr. 12.

In his opinion, dated July 21, 2008, Tr. 9, the ALJ found and concluded as follows: Plaintiff has not engaged in substantial gainful activity since September 5, 2005. Tr. 14. Plaintiff has a history of lumbar spine disc disorder with radiculopathy and chronic pain. Tr. 14. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments of 20 C.F.R. Pt. 404, Subpt. P, App. 1. Tr. 14. Plaintiff has the residual functional capacity (RFC) to

perform light work with the following limitations: Plaintiff must be able to change position every 30 minutes; Plaintiff can only carry 20 to 25 pounds occasionally; Plaintiff can occasionally twist, crawl and climb stairs; and Plaintiff cannot bend, crouch, kneel or be exposed to extreme cold.  Tr. 14.  In reaching this decision the ALJ concluded that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were inconsistent with Plaintiff's RFC. Tr. 15. Plaintiff is unable to perform his past relevant work, Tr. 16, but there are jobs in significant numbers in the national economy that Plaintiff can perform. Tr. 16. Therefore, Plaintiff has not been under a disability from January 6, 2005, through July 21, 2008. Tr. 17.

Plaintiff requested a review of the ALJ's decision. (Tr. 6.) The Appeals Counsel received additional evidence, including the revised second page of a "physical capabilities form," and denied Plaintiff's request for review on June 1, 2010. Tr. 1, 5. Thereafter, Plaintiff initiated the present action and moved for summary judgment (Docket No. 12), arguing (1) the ALJ erred in assessing Plaintiff's RFC because the ALJ did not credit Plaintiff's subjective statements concerning the intensity, persistence and limiting effects of his symptoms and the ALJ did not properly consider and weigh the statements of Plaintiff's treating physicians; and (2) as a result of the ALJ's erroneous RFC assessment, the ALJ erred by posing an inadequate hypothetical question to the vocational expert. Defendant moved for summary judgment seeking an order affirming the ALJ's decision. *See* Docket No. 14.

### b.  Employment History

Plaintiff reported that between 1999 and December 18, 2005, he worked for various companies as a service technician for heating and air condition systems. Tr. 102, 116-20.  The service technician job required lifting, walking, standing, sitting, climbing, stooping, kneeling, crouching, crawling, handling, and reaching. Tr. 102, 116. This job required Plaintiff to frequently lift 50 pounds or more. Tr. 116.

### c.  Medical Records

On September 12, 2005, Plaintiff underwent a magnetic resonance imaging (MRI) of his lumbar spine. Tr. 155; *see also* Tr. 186.  The MRI revealed that "[t]here [were] changes of disk desiccation and disk space narrowing noted at the L4-5 level as well as at the T11-12 and T12-L12 levels." Tr. 155. Thus, it was concluded that Plaintiff had "[b]road-based disk protrusion eccentric to the left at the L12-L1 level which mildly offaces the thecal sac . . . [, with] no evidence of nerve root compression." Tr. 155. It was also concluded that Plaintiff had "[s]mall to moderate left-sided disk herniation at the L4-5 extending into the left lateral recess resulting in mass effect upon the left L5 nerve root" and "facet arthropathy in the lower lumbar spine." Tr. 155.

On September 23, 2005, Plaintiff saw Matthew Hawkins, PA. Tr. 192. Plaintiff reported that he had "constant" low back and left leg pain. Tr. 192. Plaintiff reported that in early September 2005 he had "a sneeze which caused immediate low back pain and pain into the posterolateral leg to the foot and intermittently into the anterior thigh." Tr. 192. Mr. Hawkins noted that Plaintiff's lumbar range of motion was "significantly

reduced," Plaintiff ambulated with a flexed forward gait, and Plaintiff's "sensation to sharp touch is decreased over the left lateral leg and medial foot." Tr. 193.

On September 26, 2005, Plaintiff underwent a lumbar nerve root blockade at the left L5 nerve, which initially resulted in "complete pain relief." Tr. 156, 167.

On September 29, 2005, Plaintiff was seen by rehabilitation services. Tr. 161. Plaintiff reported that he hurt his back six years earlier and he recently exacerbated the symptoms by sneezing. Tr. 161. It was noted that Plaintiff had a limitation in sensation, Tr. 162, and Plaintiff was unable to tolerate any position on the treatment table. Tr. 163.

On October 13, 2005, Plaintiff saw Mr. Hawkins. Tr. 170. Plaintiff reported that the nerve root block from September 26, 2005, only gave him relief for half of a day. Tr. 170. Plaintiff reported significant low back pain and radiating left leg pain. Tr. 170. Mr. Hawkins noted as follows: Plaintiff ambulated with a limping gait; Plaintiff appeared to favor the left leg; and Plaintiff had decreased sensation along his left leg. Tr. 170. Mr. Hawkins assessed Plaintiff to have an L4-5 herniated nucleus pulposus impinging upon the left L5 nerve root with associated radiculopathy and weakness. Tr. 170.

On October 25, 2005, Plaintiff had a left-sided L4-5 microdiscectomy. Tr. 151. Plaintiff's preoperative diagnosis was an L4-5 herniated disk with radiculopathy. Tr. 151. Plaintiff met with a physical therapist following his surgery. Tr. 159. It was noted that Plaintiff's range of motion was "grossly intact." Tr. 160.

On November 28, 2005, Plaintiff saw Dr. Zhu. Tr. 171. Plaintiff reported that he was doing "quite well," his strength was improving, and he only occasionally had brief

pain going down his left leg. Tr. 171. Dr. Zhu's examination revealed that Plaintiff's strength had improved since his surgery. Tr. 171. Dr. Zhu noted the following "plan":

> Regarding work limitations.  I reviewed his work description. The only concern I have is to avoid lifting over 50 pounds and avoid slippery area where he can potentially fall and reinjure his back.  A work slip was given to him for staring work 12/05/2005, and he is aware to return and call with any concerns and questions.

Tr. 171.

On December 7, 2005, Plaintiff was seen by rehabilitation services. Tr. 164. It was noted that Plaintiff had improved since his surgery, notwithstanding the facts that Plaintiff moved slowly and changed positions guardedly. Tr. 164.

On January 5, 2006, Plaintiff underwent an MRI, which revealed "mild disk space narrowing at L4-5 which ha[d] perhaps progressed minimally since the previous study." Tr. 154. It was further noted as follows: There was "mild disk desiccation at L4-5 which [was] unchanged," Tr. 154; "[t]here was enhanced granulation tissue . . . extending around the traversing left L5 nerve," Tr. 173; "the previously noted focal left paracentral disk herniation [was] no longer seen," Tr. 154; but, there was "residual disk protrusion and peridiskal enhancing granulation tissue. Tr. 154.

On January 13, 2006, Plaintiff saw Mr. Hawkins. Tr. 188. Plaintiff reported as follows: His symptoms "never completely [went] away and [were] not as bad as they had been previous to surgery," Tr. 188; his pain was "somewhat different, as they are coming over the" anterior and lateral aspects of his left thigh, Tr. 188; and he "tried returning to work, but because of pain symptoms, he [was] unable to return to work." Tr. 188. Mr.

Hawkins noted that Plaintiff appeared to be "in a mild or moderate amount of discomfort" and Plaintiff had decreased sensation in his left lower extremity, but Plaintiff ambulated without gait disturbance. Tr. 188. Mr. Hawkins concluded that Plaintiff's scar tissue needed to be treated with "conservative measures," including a prescription for Neurontin and a nerve root block. Tr. 189. Mr. Hawkins also noted:

> [Plaintiff's] work would require him to do far too significant of activities for him to be comfortable. Because of this, I do not want him to return to work until we have followed up approximately two weeks after his nerve root block. . . . It is a possibility that he could return to work with restriction at that time, but we will likely need to refer him to a work conditioning program in the future when he is more stable in his pain symptoms, so that he can hopefully return to work without restrictions in the future.

Tr. 189.

On January 16, 2006, Plaintiff underwent a select L4 nerve root blockade. Tr. 157, 168. Plaintiff reported 50 percent pain relief after 30 minutes. Tr. 157.

On January 31, 2006, Plaintiff saw Mr. Hawkins. Tr. 181. Plaintiff reported as follows:  He had "significant relief for approximately three to four days" following his January 16, 2006 injection, but "his pain symptoms [were] returning," Tr. 181; he had muscle spasms, Tr. 181; his pain at six or seven on a ten-point scale, Tr. 181; Neurontin and Vicodin provided relief. Tr. 181. Mr. Hawkin's examination revealed "increased low back pain," and slightly decreased sensation in the left thigh and calf. Tr. 181. Mr. Hawkins diagnosed Plaintiff with "[c]hronic left leg pain related to enhancing scar tissue postoperatively involving the left L4 and L5 nerve roots." Tr. 182. Plaintiff was

prescribed Flexeril and instructed to "stay out of work until he follows up with MAPS who w[ould] take control of his workability from there on out." Tr. 182.

On February 3, 2006, Plaintiff received an epidural corticosteroid. Tr. 158, 169. Plaintiff reported 90 percent decrease in "typical pain symptoms immediately after the procedure." Tr. 158.

On February 16, 2006, Plaintiff saw Anne C. Trujillo, CNP of Medical Pain Clinics for "opinion regarding pain management." Tr. 202. Plaintiff reported as follows: He had left side lower back pain and the pain was not work related. Tr. 202. But, work activity increased his pain and he was not working because of his pain, but he was seldom absent because of pain. Tr. 202-03. Laying down decreased his pain. Tr. 202. The following activities had a variable effect on his pain: sitting, standing, walking, physical activity, leaning forward, and leaning back.  Tr. 202.  Plaintiff's chiropractic treatment and epidural-steroid injection were "somewhat" helpful. Tr. 202-03.  His pain decreased after his recent surgery. Tr. 202. His pain ranged from three to nine on a ten-point scale, but was usually at a five and was currently at four. Tr. 202. After considering all of the aforementioned statements and examining Plaintiff, Ms. Trujillo noted that Plaintiff's gait was slow and painful, but Plaintiff's lumbar spine had minimal pain. Tr. 204, 205.

On February 16, 2006, Plaintiff also saw Dr. David M. Schultz. Tr. 207.  Dr. Schultz noted that Plaintiff's symptoms consistent with lumbar intraspinal inflammation and radiculopathy, and these "[s]ymptoms have been persistent, disabling and intermittently severe." Tr. 207. Plaintiff underwent lumbar epidural steroid injection. Tr.

207. Plaintiff's pre-procedure pain was seven on a ten-point scale and post-procedure pain was two on a ten-point scale. Tr. 208.

On March 2, 2006, Plaintiff saw Ms. Trujillo. Tr. 200. Plaintiff reported that his pain was less intense compared to his last visit, and was a one on a ten-point scale. Tr. 200. Plaintiff described his pain as "under good control" and "well controlled." Tr. 200. Ms. Trujillo concluded that "[Plaintiff's] pain is under much better control following the injection. [She] recommend[ed] he return to work with a 25 [pound] weight restriction and that he use proper body mechanics." Tr. 201.

On March 7, 2006, Plaintiff saw Kristen M. Pike, LPT for an initial physical therapy evaluation. Tr. 198. Plaintiff rated his pain as a three on a ten-point scale. Tr. 198. Plaintiff reported that the following activities increased his pain: sitting, standing, dressing, sleeping, forward bending, lifting, and climbing stairs. Tr. 198. Plaintiff reported that walking had a variable effect on his pain and transitional movements were difficult. Tr. 198. Ms. Pike diagnosed Plaintiff with lumbar disc displacement.  Tr. 198.

On March 10, 2006, Plaintiff was seen by Mr. Hawkins "for evaluation and hopeful return to work with a 50 pound restriction." Tr. 179. Plaintiff reported that he hoped to return to work, but his employer would not allow him to return unless he is at a 60 pound weight restriction or more. Tr. 179. Plaintiff "otherwise den[ied] any significant changes, but [did] state his pain symptoms appear to be better with some of the more recent injections." Tr. 179.  Mr. Hawkins observed that Plaintiff ambulates without gait disturbances and Plaintiff had slightly decreased sensation in the left anterior and lateral thigh. Tr. 179. Mr. Hawkins noted the following "plan":

> [Plaintiff] and I discussed . . . that increasing his weight restriction to 50 pounds or less would not put him at any more significant risk at this time, as he is far enough postoperatively to be at a 50 pound weight restriction at this time. We did again though discuss that his pain symptoms are likely chronic in nature . . . . [Plaintiff] [was] otherwise doing well . . . and [was] given a note . . . to return to work on 3/13/2006 with a weight restriction of 50 pounds.

Tr. 180.

On March 21, 2006, Plaintiff saw Ms. Pike for physical therapy. Tr. 197.  Plaintiff reported that his pain was currently one on a ten point scale. Tr. 197. Plaintiff also reported that his pain was doing better and he did not have much pain in the mornings. Tr. 195. On March 23, 2006, Plaintiff again saw Ms. Pike for physical therapy. 196. Plaintiff reported that his pain was two to three on a ten point scale. Tr. 195. On March 27, 2006, Plaintiff again saw Ms. Pike for physical therapy. Tr. 195. Plaintiff reported no soreness after his last prescribed workout and stated that his pain was "not too bad." Tr. 195.  During all of these visits, it was noted that Plaintiff was making progress towards his goals and was tolerating treatment well. Tr. 195-97.

On June 15, 2006, Plaintiff saw Dr. Greeta Balkissoon. Tr. 227. Plaintiff reported that "he has been unable to lift greater than 35 pounds without having increase in his back pain." Tr. 227. Plaintiff reported that he lost his job in April 2006 because he was unable to comply with his work requirements. Tr. 227. Dr. Balkissoon concluded that Plaintiff "may have achieved his maximum medical improvement." Tr. 227.

On July 14, 2006, Plaintiff saw Dr. David Parker for evaluation on determination of disability. Tr. 225.  Plaintiff reported that he was injured on September 6, 2005, when

"he sneezed and developed sudden low back pain with radiation into the left leg." Tr. 225. Plaintiff reported that he continued to have low back pain, and he primarily stayed at home and did light housework. Tr. 225. Dr. Parker noted that Plaintiff had a loss of sensation on the left in an L4 distribution. Tr. 226. Dr. Parker concluded as follows:

> At this time I believe that he is able to work a six to eight hour day with changing positions as needed. With regard to lifting I placed him on 20 pound lift limit on occasional to frequent basis and 10 pounds on a more continuous basis with regard to carrying from waist level I believe that he may recently carry up to 20 to 25 pounds. I believe he be able to push up to 50 pounds if there is not a great deal of friction or tension on the object.   He may pull up to 20 pounds on frequent basis and up to 10 pounds on a continuous basis. He should avoid bending crouching and kneeling. He should avoid use of ladders. He may occasionally climb stairs. . . . He may work in a warm environment.   I think would be unlikely he would work very well cold environment or adverse conditions. He may stand and sit or walk six to eight hours in a[n] eight hour day.   However he should change positions every 30 minutes as needed.

Tr. 226.

On July 28, 2006, Plaintiff again saw Dr. Parker. Tr. 224. Plaintiff reported that his pain was eight on a ten point scale. Tr. 224. Dr. Parker reported as follows: "Job limitations: see Work Ability Report for a complete listing of job limitations.   Briefly, however the patient may return to work with the following limitations: He remains disabled." Tr. 224.

On December 26, 2006, Plaintiff saw Dr. Aysel Alti. Tr. 243-45. Dr. Alti noted that Plaintiff's "[s]ymptoms have been persistent, severe, disabling and refractory to conservative care which has included medication management, physical therapy and

spinal injection." Tr. 243. Dr. Alti implanted two thoracolumbar epidural spinal cord stimulation leads for a trial of spinal cord stimulation to control Plaintiff's pain. Tr. 243.

On January 2, 2007, Plaintiff saw Dr. Atli. Tr. 239. Plaintiff reported that his pain was a two on a ten-point scale. Tr. 239. Dr. Atli considered Plaintiff's spinal cord stimulation to be a failed trial because Plaintiff did not use it due to the discomfort it caused. Tr. 239. Plaintiff also saw Nancy Barthold, LPT and reported that his pain was two on a ten-point scale. Tr. 240. Ms. Barthold reported that Plaintiff was making progress toward his goals and he was tolerating treatment well. Tr. 240.

On January 4, 2007, Plaintiff saw Ms. Barthold. Tr. 238. Plaintiff reported that his pain was three on a ten-point scale. Tr. 238. It was noted that Plaintiff was making progress towards goals and tolerating treatment well. Tr. 238. On January 9, 2007, Plaintiff saw Ms. Barthold. Tr. 237. Plaintiff reported that his current pain level was two on a ten-point scale. Tr. 237.  Ms. Barthold concluded that Plaintiff had partially met his goals. Tr. 237. Plaintiff reported that he would like to continue physical therapy due to gains made in the past three months. Tr. 237.

On March 28, 2007, Plaintiff saw Dr. A. Nadine F. Maurer. Tr. 247. Plaintiff reported that he had pain in his low back, posterior thigh, and calf, and the pain was constant, sharp, stabbing, aching, and burning. Tr. 247. Plaintiff reported that pain was four on a ten-point scale. Tr. 247. Plaintiff reported that his prior position in heating and ventilation required frequent kneeling, twisting, lifting, bending, pushing, pulling, and lifting up to 100 pounds. Tr. 247. Dr. Maurer noted that Plaintiff walked stiffly and slowly, and Plaintiff appeared in pain when sitting. Tr. 247. Dr. Maurer diagnosed

Plaintiff with lumbar intervertebral degenerative disk disease status post L4-5 microdiskectomy with low back pain and left leg pain. Tr. 247. Dr. Maurer concluded that Plaintiff was limited in his ability to work, push, pull, lift, bend, and twist. Tr. 248.

Dr. Maurer also completed an attending physician statement for Plaintiff's disability claim. Tr. 250-52. Dr. Maurer listed Plaintiff's diagnosis as low back pain and sciatica. Tr. 250. Dr. Maurer assessed that Plaintiff could sit less than one hour per day, stand approximately one hour per day, and walk approximately one hour per day. Tr. 250. Dr. Maurer assessed that Plaintiff could not climb, twist, bend, or stoop, but Plaintiff can reach above shoulder level and operate a motor vehicle. Tr. 251. Dr. Maurer assessed that Plaintiff could occasionally lift 11 to 20 pounds and could never carry 21 to 50 pounds. Tr. 251. Dr. Maurer did not expect improvement in Plaintiff's condition. Tr. 251. In August 2008, Dr. Maurer amended her statement and asserted that Plaintiff can work zero hours per day. Tr. 251.

### d.  <u>Record from Plaintiff's Application for DIB</u>

#### i.  *Interview and Disability Reports*

In April 2006, Plaintiff completed a disability report. Tr. 100. Plaintiff identified his condition as "lower back problems." Tr. 101. Plaintiff reported that his lower back problems limited him to lifting 50 pounds or less, caused him pain and aches, and limited his ability to walk. Tr. 101. Plaintiff asserted a disability onset date of September 6, 2005, and stated that he stopped working on December 18, 2005, due to his condition. Tr. 101. In April 2006, Plaintiff also completed a work history report in which he reported that he

worked as a service technician until September 6, 2005, and discontinued working except for two days in December 2005. Tr. 108-09.

In July 2006, Plaintiff completed a second Disability Report. Tr. 126. Plaintiff reported no change in his condition. Tr. 127. Plaintiff also reported that he sometimes needed help showering and dressing as a result of "acute pain." Tr. 132.

In September 2006, Plaintiff completed a third disability report. Tr. 138. Plaintiff reported that his condition changed since his last disability report in that he had a "weight restriction of 30" pounds and he was terminated from his employment because he could not meet the weight requirements in March 2006. Tr. 139. Plaintiff also reported that he continued to need help showering and dressing. Tr. 142.

### ii.  Physical RFC Assessment

On May 12, 2006, Dr. Aaron Mark conducted a physical RFC assessment.  Tr. 216-223.  Dr. Mark identified Plaintiff's exertional limitations as follows: Plaintiff can occasionally lift 50 pounds; Plaintiff can frequently lift 25 pounds; Plaintiff can stand and walk about six hours in an eight-hour workday; Plaintiff can sit about six hours in an eight-hour workday; and Plaintiff has no limit to his ability to push or pull. Tr. 217. Dr. Mark identified the following postural limitations: Plaintiff can frequently climb ramps or stairs, and balance. Tr. 218. Plaintiff can occasionally climb a ladder, stoop, kneel, crouch, and crawl. Tr. 218. Dr. Mark concluded that Plaintiff's symptoms were attributable to a medically determinable impairment; the severity or duration of the symptoms is not disproportionate to the expected severity; and the severity of symptoms

is consistent with the total medical and nonmedical evidence. Tr. 221.  Dr. Mark relied on

Mr. Hawkins' weight restriction in reaching the conclusion. Tr. 222.

On August 2, 2006, Dr. Charles T. Grant completed a request for agency

consultant advice and affirmed Dr. Mark's assessment as written. Tr. 233-34.

### iii.  Hearing Transcript

On March 27, 2008, Plaintiff and his wife appeared for his hearing before the ALJ.

Tr. 18. Plaintiff testified at the hearing as follows: He can drive for one half hour at a

time. Tr. 25. He can walk for 15 minutes before his back pain begins. Tr. 27. He can sit

between 15 and 30 minutes and he is generally able to care for himself. Tr. 28. He is able

to perform chores, such as cooking, washing dishes, laundry, and carry light grocery

bags. Tr. 28-29. He does not take medication on a regular basis. Tr. 29. He continued to

perform the exercises prescribed by physical therapy and as result has been able to keep

his pain level down. Tr. 32. He agreed with the limitations identified by Dr. Maurer, but

he did not believe his condition changed between July 2006 and March 2007. Tr. 33.

Plaintiff also testified as follows: Plaintiff attempted to work at a "parts counter,"

but this exacerbated his condition. Tr. 35. Four days per week he took photography

classes that lasted three to four hours. Tr. 36. After the classes, Plaintiff needed to lay

down because of pain. Tr. 36. Plaintiff sometimes has trouble sleeping. Tr. 36. Plaintiff

reported that he also had difficulty concentrating as a result of his condition. Tr. 39.

William Rudenbeck testified as the vocational expert. Tr. 39. The ALJ presented

Mr. Rudenbeck with three hypothetical individuals who were similar to Plaintiff in all

relevant respects.  The third hypothetical is of most relevance to the present opinion; in it,

the ALJ presented an individual who is similar to Plaintiff in all relevant characteristics, and can "intermittently" only sit one hour, can only stand one hour, can only walk one hour; cannot climb, twist, bend, or stoop; can reach above his shoulder and operate a motor vehicle; and can lift up to 20 pounds occasionally. Tr. 42. Mr. Rudenbeck testified that if "intermittently" meant that the hypothetical individual could only work three-hours per day, then such a person could not perform competitive employment. Tr. 42. Mr. Rudenbeck testified that if "intermittently" meant that the hypothetical individual required positional changes every hour, then, like the second hypothetical individual, such an individual could not perform Plaintiff's past relevant work, but such an individual could perform unskilled light work, such as production, assembly, or packaging. Tr. 43.

Mr. Rudenbeck also testified that if a hypothetical individual described above needed to lie down during the afternoon, then the hypothetical individual could not maintain competitive employment. Tr. 43.

## III.  DISCUSSION

Plaintiff brings his motion for summary judgment, arguing that the ALJ erred in denying Plaintiff's application for benefits because the ALJ erred in weighing the medical opinions, in his evaluation of Plaintiff's credibility, and in posing an adequate hypothetical question.  For the reasons set forth below, this Court concludes that the ALJ erred in his assessment of the medical opinions, and therefore, the ALJ's RFC assessment is not supported by substantial evidence on the record as a whole. Given the error made

by the ALJ in this matter, this Court cannot review the ALJ's assessment of Plaintiff's credibility and the adequacy of the hypothetical.

### a. **Standard of Review**

Review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). "Substantial evidence on the record as a whole, . . . requires a more scrutinizing analysis." *Id.* (quotation omitted). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir.1993).

To be entitled to DIB, a claimant must be disabled. 42 U.S.C. § 423(a)(E). A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505. The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of the Social Security Act. 20 C.F.R. § 404.1520(a)(4). The five steps are: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can

return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy. *Id.* at § 404.1520(a)(5)(i)-(v). The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner. *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

### b. <u>Residual Functional Capacity</u>

In steps four and five, the ALJ assesses an individual's RFC. 20 C.F.R. § 404.1520(a)(4)(iv)-(v). "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence. The ALJ, however, still bears the primary responsibility for assessing a [Plaintiff's RFC] based on all relevant evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005) (citations and quotation omitted.) The ALJ considers "all of the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(3). An ALJ must consider medical opinions from treating and nontreating sources, *id.* at § 404.1527(d), and an "ALJ must resolve conflicts among the various opinions." *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009). "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." *Jenkins v. Apfel*, 196 F.3d 922, 924-25 (8th Cir. 1999) (quotations omitted.)

The ALJ concluded that Plaintiff had the RFC to perform light work. Tr. 14. In reaching this conclusion, the ALJ considered Plaintiff's treatment history and the opinions of Plaintiff's treating physicians, in particular, the opinion of Dr. Maurer. *Id.* In weighing the medical opinions, the ALJ granted greater weight to the opinions of Dr. Maurer and the other treating physicians because they were consistent. *Id.* at 14-15.

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence in the record as a whole because the ALJ erred in weighing the medical opinions. Specifically, Plaintiff contends that the ALJ failed to discuss the weight given to the medical opinions; Dr. Maurer's opinion actually supports that Plaintiff is disabled; and Dr. Parker's opinion supports that Plaintiff's condition is substantially more limiting than reported by the ALJ.

As an initial matter, the ALJ did not fail to discuss the weight given to the medical opinions. The ALJ explicitly concluded that the medical opinions of Plaintiff's treating physicians were consistent in that they all supported that Plaintiff could perform light work. *See* Tr. 15-16. The ALJ also concluded that all of the treating physician's opinions should be accorded more weight than the state consultative physician. *See id.*

As to Dr. Maurer, the ALJ concluded as follows: "The claimant had another physical capacity evaluation by Dr. Nadine Mauer (sic) on March 28, 2007 (Exhibit 12F). She indicated that he would have *no difficulty* sitting, standing, or lifting up to 20 pounds (Exhibit 12F)." Tr. 15 (emphasis added). Looking at Exhibit 12F (Tr. 247), Dr. Maurer first notes that Plaintiff's pain is "[a]ggravated with . . . lifting, . . . sitting, standing, [and] walking, . . . ." Tr. 247. Dr. Maurer also concludes that "[Plaintiff] continues *to be limited* with working, with pushing, pulling, lifting, bending, twisting. He does need disability paperwork filled out." Tr. 248 (emphasis added). When completing said disability paperwork, Dr. Maurer noted that Plaintiff's ability to sit was less than one hour; Plaintiff's ability to stand was 1 hour; and Plaintiff's ability to walk was limited to one hour. Tr. 251. All of these abilities were characterized as "intermittently." Tr. 251.

Dr. Maurer later amended this opinion to state: "Patient can work a total of [zero] hours per day." Tr. 255.  The ALJ did not present the amended opinion to the vocational expert and the ALJ wrote in his opinion, with reference to Dr. Maurer, "Patient *has difficulty* with sitting, standing [and] lifting 20 pounds."  Tr. 251, 255 (emphasis added).  Thus, there is no reading of Dr. Maurer's reports that would support a conclusion that Plaintiff has "no difficulty" in the described areas.  As such, it is clear that the ALJ erred in his assessment of Dr. Maurer's opinion.

Having concluded that the ALJ erred in his review of the record, this Court must consider whether the ALJ's misreading of the record constitutes harmless error.  The Eighth Circuit Court of Appeals has held that, in the context of social security cases, an ALJ's error is harmless if the ALJ would have inevitably reached the same result based upon a correct reading of the record.  *See Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008) (holding that "[t]here is no indication that the ALJ would have decided differently had he read the hand-written notation to say 'walk' rather than 'work'"); *Dewey v. Astrue*, 509 F.3d 447, 449-50 (8th Cir. 2007) (holding that an error was not harmless because the record included a more restrictive opinion); *Deckard v. Apfel*, 213 F.3d 996, 998 (8th Cir. 2000) (holding that an ALJ did not err by failing to consider an opinion that was not material to the ALJ's finding that Plaintiff was not disabled).

This Court cannot say that the ALJ would have reached the same result based upon the correct reading of the record.  First, Dr. Maurer's amended opinion could be interpreted to support the conclusion that Plaintiff lacked the RFC to perform light work. If the ALJ's erroneous reading of Dr. Maurer's opinion or Dr. Maurer's amended opinion

were simply a matter of degree, then this Court could hold that Dr. Maurer's opinion was not material to the ALJ's RFC assessment. But, the ALJ's erroneous reading of Dr. Maurer's opinion was more than a matter of degree because Dr. Maurer's opinion can actually be interpreted to support a determination contrary to the RFC.

Second, this Court cannot conclude that the ALJ's error was harmless because it is evident that the ALJ assigned particular significance to the opinion of Dr. Maurer. Dr. Maurer is the only physician cited by name within the ALJ's decision and the ALJ relied in part upon his reading of Dr. Maurer's opinion to conclude that the opinions of the treating physicians were consistent. But, Dr. Maurer's initial opinion and amended opinion can be interpreted to be inconsistent with the other medical opinions. As such, this Court cannot affirm the ALJ's weighing of the medical opinions because they are not definitively consistent. To wit, to affirm the ALJ's weighing of medical opinions, this Court would have to conclude that the ALJ would have rejected at least some portions of Dr. Maurer's amended opinion. Such a conclusion would require that this Court weigh evidence and only the ALJ can resolve conflicts among medical opinions. *Heino*, 578 F.3d at 879.

Finally, this Court cannot say that the ALJ's error was harmless because the ALJ relied upon his reading of Dr. Maurer's report for his assessment of Plaintiff's credibility, and the ALJ used his reading of Dr. Maurer's initial opinion as the basis of the hypothetical submitted to the vocational expert and, thus, relied upon his reading of Dr. Maurer's initial opinion for the RFC. This Court would have to conclude that the ALJ would have reached the same decisions for Plaintiff's credibility, the hypothetical, and

the RFC under the correct reading of Dr. Maurer's opinion and amended opinion.  This

Court cannot reach this conclusion without substituting its own judgment with that of the

ALJ and findings of fact. *Woolf*, 3 F.3d at 1213.

As to Dr. Parker's opinion, Plaintiff contends that the ALJ erred in his reading of

Dr. Parker's opinion or, in the alternative, that there is ambiguity in Dr. Parker's opinion,

which the ALJ should have resolved.  This Court agrees that the Dr. Parker's opinion is

ambiguous. The ALJ did not cite Dr. Parker by name, but instead grouped all of the Park

Nicollet treatment records into one opinion. Nevertheless, it is evident that the ALJ

heavily relied upon Dr. Parker's opinion. The record supports that on July 14, 2006,

Plaintiff saw Dr. Parker, who concluded that Plaintiff had certain work restrictions, which

were cited by the ALJ.  Tr. 15. The record also supports that on July 28, 2006, Plaintiff

saw Dr. Parker again and Dr. Parker reported as follows: "Job limitations: see Work

Ability Report for a complete listing of job limitations.  Briefly, however the patient may

return to work with the following limitations: He remains disabled." Tr. 224.  The ALJ

cited Dr. Parker's July 14, 2006 restrictions, but attributed the restrictions to the July 28,

2006 appointment. Tr. 15.

On the one hand, "remains disabled" can be read to be consistent with the

limitations identified within the Work Ability Report, or "remains disabled" can mean

that Plaintiff's limitations do not permit him to return to his work as a service technician.

On the other hand, "remains disabled" can be read as an updated statement of Plaintiff's

condition. On remand, the ALJ can resolve the ambiguity as to Dr. Parker's opinions.

### c.  <u>Remand</u>

Plaintiff contends that reversal without remand is appropriate.  Given the state of the record and the ALJ's opinion, this Court cannot endorse that Plaintiff is entitled to benefits based upon the present record.  There is evidence in the record to support the position of the Commissioner.  Thus, remand under sentence four of 42 U.S.C. § 405(g) is warranted. On remand the ALJ shall render a decision based upon the correct reading of Dr. Maurer's opinion and shall explicitly resolve any ambiguity found within the medical opinions.  Moreover, on remand the ALJ can receive additional evidence and seek additional evidence, clarification, or consultative examination, as necessary.

## IV.   RECOMMENDATION

Based upon the record and memoranda, **IT IS HEREBY RECOMMENDED**:

1.  Commissioner's Motion for Summary Judgment (Docket No. 14) be **DENIED**;

2.  Plaintiff's Motion for Summary Judgment (Docket No. 12) be **GRANTED IN PART** and **DENIED IN PART**;

3.  The decision of the Commissioner be **REVERSED** and this matter be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings that are consistent with this opinion; and

4.  **JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: January  30 , 2012

_s/ Tony N. Leung_
Magistrate Judge Tony N. Leung
United States District Court
for the District of Minnesota

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **February 14, 2012**. A party may respond to the objections within fourteen days after service thereof. Any objections or responses shall not exceed 3,500 words. The District Judge will make a de novo determination of those portions of the Report and Recommendation to which objection is made. The party making the objections must timely order and file the transcript of the hearing unless the parties stipulate that the District Judge is not required to review a transcript or the District Judge directs otherwise.